ARNOLD et al. v. GARTH et al.

(Circuit Court, W. D. Missouri, W. D. February 5, 1901.)

No. 2,377.

**1.** Constitutional Law—Special Legislation.

It was within the power of the legislature of Missouri, prior to the constitution of 1865, to pass special acts authorizing the sale of the present interest of minors in real estate, and the reinvestment of the proceeds, or their employment for the immediate wants and welfare of the minors. But such power was not wholly without limit or restraint. It could not be so exercised as to annul, alter, or change the settlement or disposition of property directed by deed or will, nor so as to give to the life tenant in the land the benefit or enjoyment of the interest therein of such minors as remainder-men.

**2.** Same.

The foundation of such power being in its nature parental or tutorial by the state for the purpose of kindness, in providing for the well-being of persons not sui juris, a legislative act showing on its face that its underlying purpose was not to make such provision for the wants and welfare of minors, but was to convert their interest in remainder into money, to be held and enjoyed by the life tenant, is void.

3. MINORS—SALE OF REALTY—VALIDITY.

Where, between the time of the passage of such law and the sale of the land under the power, two of the minors became of age, the sale as to them is void, and they are entitled on the death of the life tenant to maintain ejectment for the recovery of their interest as remainder-men.

4. EJECTMENT—DEED—PURCHASE PRICE.

The defendants in ejectment in this case, in order to defeat the recovery of one of the plaintiffs, who became of age before the execution and delivery of the deed under the power, put in evidence an alleged title bond, executed by the donees of the power to the vendee, made prior to the majority of such plaintiff. *Held* that, to make such deed relate back to the date of such title bond, the title bond must show on its face that the contract was such that the purchaser could have enforced it against the vendors; that the alleged title bond, failing to state on its face the purchase price of the land, was bad, under the statute of frauds, and furnished no authority for the conveyance of the land after the plaintiff became of age. While the title bond recited that "we have sold," such words in the title bond mean only that the owners have agreed and contracted to sell.

5. SALE OF INFANT'S LAND—POWER MUST BE STRICTLY FOLLOWED.

The grant of such power by the legislature to A. and B. was a naked power,—a personal trust reposed in the designated donees,—and could not be delegated by them to C. Therefore a sale of the land by C. under power of attorney from A. and B. authorizing him, for them, to bargain, sell, and convey, and a deed by the attorney reciting that he did bargain, sell, and convey, is ineffectual to pass the interest, other than that of A. and B., in the land.

6. SAME.

Where such act of the legislature directed a sale for cash or on credit, a conveyance in consideration of a negro and horses is void as to such minors.

7. EJECTMENT—COMPETENCY OF EVIDENCE.

Where the defendants in such ejectment suit, in an attempt to show that the plaintiffs had received a part of the consideration of the conveyance made by the donees of the power, took plaintiffs' depositions, and by their own questions called for hearsay testimony as to the consideration for the sale of the land, drawing out the answers that it was a negro and horses, and then filed such depositions in court, an objection made by them to plaintiffs' offer to read same, on the ground of incompetency, ought not to be allowed.

8. DEED CONSTRUED.

A deed to A., habendum to A. and the heirs of her body, under the Missouri statutes of 1845, created a life estate in A., remainder in fee simple to the heirs of her body. On the death of the life tenant the estate vests in fee, as tenants in common, in the children born of her body surviving at the termination of the life estate.

9. STATUTE OF LIMITATIONS.

As the remainder-men were not entitled to enter the premises until the termination of the life estate, the statute of limitations neither by lapse of time nor adverse possession began to run until the death of the life tenant.

(Syllabus by the court.)

At Law.

In 1855 Joel Turnham executed a deed to the land in controversy, situated in Clay county, Mo., with the habendum clause to Ann R. Arnold "and to the heirs of her body"; the said Ann being the daughter of said Turnham. In 1859 the legislature of the state of Missouri passed an act authorizing said Joel Turnham and Ann R. Arnold to sell and convey all the right, title, and interest, contingent or otherwise, of Joel T. Arnold, David D. Arnold, Charles B. Arnold, Edward C. Arnold, Allen K. Arnold, and Louisa E. Arnold, who were the then living children of the said Ann R.

Arnold, in and to said land. The act authorized such sale to be made privately or publicly, for cash or on credit. The other material provisions of this act are sufficiently noted in the opinion of the court. On January 1, 1862, said Joel Turnham and Ann R. Arnold made what is called a "title bond," the condition of which was that: "Whereas, said Joel Turnham and Ann R. Arnold have sold to William Austin a certain tract or parcel of land lying and being in the county of Clay, in the state of Missouri, and bounded as follows, to wit, on the north by F. M. Hutchinson, on the south by John L. Howard, on the west by George Stone, and on the east by F. Tilford, containing 160 acres, more or less, the said Turnham and Ann R. Arnold having derived their authority to sell the same by act of the Missouri legislature made about three years ago: Now, if the said Turnham and Ann R. Arnold well and truly make, or cause to be made, a good and sufficient deed according to the provisions of said act as aforesaid," etc. On February 1, 1862, said Joel Turnham and Ann R. Arnold executed a power of attorney constituting and appointing J. T. Downing their true and lawful attorney in fact, "for us and in our names to bargain, sell, alien, and convey unto William Austin a certain tract of land situate, lying, and being in the county of Clay, in the state of Missouri, and containing 160 acres, and is described in the annexed bond for titles made by us unto said William Austin, and to make said William Austin a warranty deed to same, and to do all acts in reference to the same," etc. On June 2, 1862, said Downing, under said power of attorney, made a deed to said land to said Austin, which, after reciting said deed of 1855, the said act of the legislature, and the making of said power of attorney to him, recited that, in conformity with the power to him delegated in said power of attorney, he had bargained and sold to said William Austin the tract of land mentioned and described in said instrument. The defendants in this case claim title by mesne conveyances from said Austin. The said Ann R. Arnold died in October, 1896, leaving these plaintiffs and two other children surviving her. These plaintiffs have brought this action of ejectment to recover, each, an undivided one-fourth interest in said land. Before the alleged contract of sale under the title bond of said land, the plaintiff Joel T. Arnold became of age, and the plaintiff David D. Arnold became of age between the date of the making of the alleged title bond and the execution of the deed by Downing under the power of attorney. Other material facts sufficiently appear in the opinion of the court.

Monta J. Moore, L. C. McBride, and Ashley, Gilbert & Dunn, for plaintiffs.

B. F. Finley, J. M. Sandusky, H. F. Simrall, and Holmes & Perry, for defendants.

PHILIPS, District Judge. This is an action of ejectment for the recovery of certain lands in Clay county, Mo., submitted to the court without the intervention of a jury, on an agreed statement of facts, with other additional facts found by the court on further evidence.

Prior to the adoption of the state constitution of 1865, inhibiting special legislation, it is to be conceded to the defendants that it was within the power of the legislative department of the state to pass special acts authorizing the sale of present interests of minors, persons non compos mentis, and the sale of minors' lands by administrators to pay the debts of the estate, and the like. It must, however, stand to principles of universal right, which inhere in the very genius of our institutions, that this legislative power was not wholly unbridled. In the first case (Stewart v. Griffith, 33 Mo. 13) that came before the supreme court of this state, involving a judicial inquiry into the exercise of this legislative power, the court seemed impressed with the conviction that such special legislation was

fraught with abuse and danger; that it might become (just what the experience of this state has demonstrated) an instrumentality for despoiling minor children of their patrimony and grants under deeds and wills. Hence it was that the court took occasion, in the closing paragraph of its opinion, to say:

"Whilst we maintain the validity of this law, we think that we violate no rule of propriety or courtesy in expressing a decided opinion of the general impolicy of acts of like character."

It was because of the outrageous abuses whereby minor children were, in the end, stripped of their landed estates by such legislation, that, in common with most states of the Union, the state of Missouri, by constitutional amendment, in 1865, took away this power from the legislature. It is not too much, therefore, to say that the judiciary, ever standing as the trusted minister of justice, while observing the dividing line between the legislative and judicial departments, ought nevertheless to hew close to the line, and see to it that such legislative acts are kept within exact bounds. In a constitutional government there are fundamental rules and principles which neither the makers nor expounders of the law may violate or disregard. And it is the province of the courts, under our system of government, to determine when the boundary line of power has been passed by any department of government. In the case supra the court, speaking to this subject, said:

"The view which we have taken of the subject is expressly based upon the idea that the act in question directs only the management of the property of the infants, changing its form and directing its use for their own benefit. Had the act undertaken to appropriate their property to the use of any other person, it would have been void, because 'retrospective in its operation,' by destroying rights previously vested by law. In like manner, an act which would undertake to annul or alter a settlement or disposition of property lawfully made by deed, last will, or other means would be void. The property acted on in this case is understood to have been absolutely the property of the infants, subject to their free use and disposal under the limitations and provisions of the general law. Had the land been devised to them, with a provision in the devise limiting their power to dispose of it before they should attain the age of twenty-one years, we are of opinion that no power in the state could authorize them, or any other person for them, to dispose of it before that time, because by so doing the lawful act of the devisor in thus limiting his devise would be annulled by an act 'retrospective in its operation.' "

The land in this case was conveyed to the mother of these plaintiffs and the heirs of her body. The deed determined and fixed the quality and nature of their estate. It was not competent for the legislature or the courts to alter that grant. The legislature could neither take away nor diminish, much less destroy, the contingent interest of the remainder-men, and consequently could not put it in the power of any agent to do or attempt to do so. The estate of Ann R. Arnold was that of sole tenant for life. The fruit of its use during her life inured to her absolutely. The remainder-men could have no vested interest in the land, no right under the deed creating the estate to enjoy the grant, until after the termination of the life of the mother. So much so is this true, that if these plaintiffs had made a deed to the land, and died before the mother,

the deed would have been void. Emmerson v. Hughes, 110 Mo. 627, 19 S. W. 979.

It will be found that the foundation of the exercise of the legisla-tive power in authorizing the sale of real estate of minors, and its conversion into some other form of security, rests primarily upon the proposition that the state stands in the relation to such parties of a paterfamilias, to look after their immediate welfare, wants, and the like. The leading American case establishing this doctrine is that of Rice v. Parkman, 16 Mass. 326. In that case, Thankful, the wife of Asaph Rice, died seised in fee of the demanded premises, leaving her husband and minor children surviving. The husband took by curtesy, and the children became seised in fee of the remain-der expectant on the death of the father. In their case the remain-der vested in the children on the death of the mother, as tenants in common, and the interest or estate of each child could not be terminated by death prior to that of the tenant by curtesy. In that case the legislature of Massachusetts, by joint resolution of the two houses, authorized a sale of the demanded premises by said Asaph Rice (he first giving bond, etc.), with directions that the proceeds thereof should be put on interest, with good security, for the use of the children of the said Thankful. Chief Justice Parker, in jus-tifying this act of the legislature, said:

"It seems absolutely necessary for the interest of those who, by the gen-eral rules of law, are incapacitated from disposing of their property. that a power should exist somewhere to convert the lands into money; for other-wise many minors might suffer, although having property, it not being in a condition to yield an income. This power rests in the legislature in this commonwealth, that body being alone competent to act as the general guard-ian and protector of those who are disabled to act for themselves. * * * No one imagines that under this general authority the legislature could deprive a citizen of his estate, or impair any valuable contract in which he might be interested. But there seems to be no reason to doubt that upon his applica-tion, or the application of those who properly represent him, if disabled from acting himself, a beneficial charge of his estate, or a sale of it for purposes necessary and convenient for the lawful owner, is a just and proper subject for the exercise of that authority. It is in fact protecting him in his prop-erty, which the legislature is bound to do, and enabling him to derive sub-sistence, comfort, and education from the property, which might otherwise be wholly useless during that period of life when it might be most bene-ficially employed. * * * It is not legislation, which must be by general acts and rules. but the use of a parental or tutorial power, for purposes of kindness, without interfering with or prejudice to the rights of any but those who apply for specific relief. The title of strangers is not in any de-gree affected by such an interposition."

It is not too much to say that it will be found upon examination that all such valid legislative acts were bottomed upon the idea of a "parental or tutorial power" for purposes of kindness, in providing sustenance, education, and the like, to parties not sui juris. The act of the legislature in question presents no such purpose. It is a cheat upon its face, an imposition upon legislative credulity, and inattention to the express provisions of the deed of Joel T. Turn-ham to Ann R. Arnold and the heirs of her body. It is disclosed by one of the depositions in this case that Joel T. Turnham, grantor in said deed, the father of Ann R. Arnold, was, at the time of the

passage of the legislative act in question, a member of the state legislature, and presumably was the author of the act in question.   As if to satisfy the conscience of the author of the bill, as a justification for the contemplated design to practically set aside the habendum clause of his deed, so that his daughter could enjoy the whole beneficial interest of both the life estate and contingent remainder, it is recited in the preamble of the act of the legislature, that, "Whereas, said conveyance was made by said Joel T. Turnham without any monied consideration therefor, and wholly from paternal affection, for said daughter and her children:   Therefore," etc.   This preamble further recites that the deed created an estate in said Ann "for and during the period of her natural life, and at her death to her children in equal proportions."   There is a marked difference ·in a grant to A. for life, and to the heirs of her body, and a grant to A. for life, and to her children.   Emmerson v. Hughes, 110 Mo. 630, 19 S. W. 979.   The preamble recites, as a reason for the enactment for the special act, "that it is believed to be to the interest of the donees to sell the same and reinvest the proceeds in other real estate for the same uses."   No bond was required of the agents or trustees.   No provision whatever was made in the act for utilizing the proceeds of the sale for any present necessity or benefit of the minors.   It was not to be used for their education, rearing, or other present advantage.   No income from it, and its application to the benefit of the minors, was provided for.   After having recited in the preamble, as a justification for the passage of the act, that it was believed to be to the interest of the minors to sell the land and reinvest the proceeds in other real estate for the same uses, the act itself directed that the "proceeds of such sale shall be trust funds in the hands of said Joel T. Turnham and Ann R. Arnold, to be held or reinvested by them subject to the same uses and limitations as the land now is held."   So the proceeds could be "held" at the sweet will of the donees of the power, without bond or restraint.   The sequel proves that they elected to hold it, and to hold it for 34 years, until the death of Ann R. Arnold, and no part of it was ever applied to the uses or benefit of these plaintiffs. The heirs could not have compelled her to reinvest the proceeds "subject to the same uses and limitations as the land now is held," for the reason that the act gave the option to the donees of the power either to "hold or reinvest."   If the language "subject to the same uses and limitations as the land is now held," qualifies the term "to be held," as the term "or reinvest," then the proceeds held were subject to the same uses and limitations as were by the deed of Joel T. Turnham imposed upon the rights of the heirs in the land; that is, to become available to them only on the death of Ann, the life tenant.   If such a legislative act did not, within the language of the court in Stewart v. Griffith, supra, change the form of the grant to the heirs, and direct its use for the benefit of the donees of the power, and change in its essential purposes the grant under Turnham's deed, it would be difficult to define any limitations upon the exercise of such legislative power.   By this act, as already stated, no provision was contemplated for the present welfare of the

minors. An interest in the lands, which by the provisions of the deed was intended not to become available to them as a vested estate until the death of the mother, is to be sold as a present interest, and the proceeds held by strangers as trust funds until the death of the life tenant, with no directions for its employment or its income; thus perverting and thwarting the express delegation of the grant. There did not, on the face of the act, appear any requisite jurisdictional fact to invoke the exercise of the legislative power, other than the statement in the preamble that it was deemed to be for the welfare of the minors that the proceeds should be reinvested in other real estate for the same uses, when the act itself did not affirmatively require this to be done, but authorized other uses of it. I am unalterably opposed to such legislative jugglery with the rights and interests of minor heirs.

If this view of this act be untenable, the conveyance by Turnham and Ann R. Arnold to Austin must fail as to the plaintiff Joel T. Arnold for the reason that before it was made he had attained his majority. He became of age prior even to the making of any contract for the sale of the land. No matter what color the astute counsel for defendants may find in the language of some courts for the contention that, where an estate is held in common by minors and others sui juris, the legislature might order a sale of the interest of all, as it might aid the sale and benefit all, it is sufficient to say that such a doctrine has found no countenance in this state; and, in my opinion, it is utterly repugnant to the personal rights of manumitted persons. In Clusky v. Burns, 120 Mo. 574, 25 S. W. 586, the court said:

"The authority by the legislature can go no further than to authorize the sale of the land of such persons as are under such disability as prevents them from exercising that right in their own names, unless it be for the satisfaction of legal charges upon the land, or for the payment of debts subject to which the title is held. Probably no case can be found reported which upholds a sale made under authority of an act of the legislature by which the person authorized conveyed, without his consent, the land of another, who was himself capable of transacting his own business, except under circumstances above stated. On the contrary, all the decisions which speak at all on the subject assert the contrary. Such a sale would be equivalent to depriving the owner of his property without due process of law, and would be violative of both the state and federal constitution."

The legislature, even in the zenith of its reveling in the exercise of this power, never attempted to authorize a sale of the real estate of a person of legal age. In the act in question the framer recognized the legislative policy of the state; for he omitted therefrom the name of Robert H. Arnold, one of the children of said Ann, who was at the time of age. The donees of the power having but a naked power, not coupled with an interest, to sell the interest of the minors in the land, it must follow that when a minor became of age the power, as to him, ceased.

In respect of the other plaintiff, David Arnold, who became of age in April, 1862, prior to the execution of the deed of conveyance to Austin, the contention of defendants' counsel is that the donees of the power had made the contract of sale of the land in

January, 1862, during the minority of said David, which contract only awaited execution and delivery of the deed to complete it, as this was only a mere ministerial act, which had relation to the inceptive act of making the contract of sale evidenced by the title bond. There are serious obstacles in the way of this contention. While the title bond recites that the donees of the power "have sold," such words employed in a title bond mean only that the owners have agreed and contracted to sell. Atwood v. Cobb, 16 Pick. 229, 230. It was not a completed sale. The purchase price, evidently, had not been paid. If it had been paid, there was no occasion for a bond to convey, as the obligors could, and presumably would, have executed a deed at once. To sustain the position of defendants, therefore, it must appear that, at the time David Arnold reached his majority, Austin apparently held an executory contract for the purchase of David's interest in the land, which was susceptible of specific performance at the suit of Austin. The contract of sale disclosed no consideration whatever paid or to be paid by Austin for the land. The supreme court, in Kelly v. Thuey, 143 Mo. 435, 436, 45 S. W. 303, say:

"In all contracts of sale, assignment, and the like, the price is, of course, a material term. It must either be fixed by the agreement itself, or means must be therein provided for ascertaining it with certainty. In the absence of such provision, either stating it or furnishing a mode for fixing it, the agreement would be plainly incomplete, and could not be enforced; and, if the contract is written, this term must appear in the memorandum or written instrument. In this case the contract neither states the price, nor furnishes the means or data whereby that price can be computed or ascertained, and is therefore an invalid contract, and wholly incapable of enforcement. The memorandum being required to be complete in and of itself, parol evidence cannot be admitted to piece out the incomplete writing and make it a complete instrument. At one time in this court the heresy was announced that parol testimony was admissible for the purpose indicated. O'Neil v. Crain, 67 Mo. 250. The last erroneous adjudication on this subject is found in Ellis v. Bray, 79 Mo. 227; but the contrary and correct ruling was declared in Ringer v. Holtzclaw, 112 Mo. 519, 20 S. W. 800, and followed in Boyd v. Paul, 125 Mo. 9, 28 S. W. 171. We hold, therefore, that there is no contract in the case at bar; that is, such a one as satisfies the requirements of the statute of frauds."

See, also, Grafton v. Cummings, 99 U. S. 101–106, 25 L. Ed. 366; Soles v. Hickman, 20 Pa. St. 180.

No reference whatever is made to this alleged contract of sale in the deed made by Downing under the power of attorney. The execution of the deed and the acknowledgment of the specified purchase money, through the power of attorney, after David became of age, were therefore entirely voluntary, and had no more effect than would a conveyance by a guardian after his ward had become of age. The power to convey his interest ceased when he attained his majority. Furthermore, the act of the legislature authorized the donees of the power to sell "for cash or on credit"; that is, if the purchaser did not pay cash in hand, he should agree to pay cash at a future specified time. As said in Morrill v. Cone, 22 How. 81, 16 L. Ed. 255:

"The authority conferred upon the mandatary by the letter of attorney is special and limited, and his acts under it are valid only as they come within

its scope and operation. He was bound to conform to the conditions it contains, and in its execution to adopt the modes it indicates. He was authorized to sell the lands for cash, or on credit with security on real property, to execute a deed describing the consideration, acknowledging its payment, and to receive the money or securities the purchaser might render. But he was not authorized to exchange the lands for other property or accept the notes of the vendee as cash, or to accept personal security, or any form of security except that specified in the condition. 'Non est in facultate mandatarii addere vel demere ordim sibi dato.'"

After dissenting from the contention of counsel in that case that subsequent purchasers were entitled to repose credit in the recitals of the attorney expressed in the deed, the court said:

"The attorney was not invested with the legal estate. He was the minister, the servant, of his constituent, and his authority to convey the legal estate did not arise except upon a valid sale in accordance with the requirements of the power. The deed executed by the attorney is apparently within the scope of his power, and the admission of payment of the consideration is competent testimony of the fact. But it is competent for his principal to show that the transaction was in appearance only, and not in fact, within the authority bestowed."

See, also, Depuiron v. Young, 134 U. S. 241, 10 Sup. Ct. 539, 33 L. Ed. 923; Pettis Co. v. Gibson, 73 Mo. 502.

The plaintiffs contend that the sale was not made for cash or on credit, but that the consideration was a negro and a lot of horses delivered by Austin to Ann R. Arnold. If this is true, the contract under the title bond could not have been enforced by Austin, as the sale would have been a clear departure from the express limitations placed upon the agency of Turnham and Mrs. Arnold by the act of the legislature. Objection was made by defendants at the hearing to the reading of depositions relied on by plaintiffs to establish the fact of the exchange of the land for the negro and horses, as incompetent. The defendants, evidently for the purpose of showing, if they could, that plaintiffs, after they became of age, were cognizant of the sale of the land, and ratified the same by receiving a part of the purchase money, in some form or other, from Turnham or their mother, took the plaintiffs' depositions in Texas. In the examination by defendants' attorney of the plaintiff David Arnold, the following questions were propounded, and answers made thereto:

"Q. When your mother and grandfather sold the land in Missouri, what did they do with the proceeds? A. The proceeds died. Q. If you know anything about it, state it. A. I was not there when the trade was made,—at my grandfather's, in Milam county, when the trade was made. Q. You don't know, then, what your mother and grandfather did with the proceeds of the Missouri lands? A. She received all they got for the land. Q. How do you know? A. I saw the property, is how I know. Q. When did you see the property? A. I think, about December, 1862. I came home from the war on a furlough. Q. What was it? A. A negro man and some mares,—I think, nine head. Q. What was the age of the negro man? A. I suppose he was about 25 years old. Q. What was his name? A. Jim. Q. What became of him? A. He died. Q. When? A. Very shortly after he was traded for.—I think, in 1863.

"Cross-examination. Q. I understand you to say that the consideration your mother and grandfather received for the land in controversy was one negro and nine mares. State, if you can, what you understand to have been the value of the negro. A. My understanding was, at the time I learned of the matter, that one thousand dollars she was to allow for the negro. Q.

State your understanding as to what the value of the mares was. A. I think she allowed a hundred and fifty dollars per head for the mares. Q. You say the negro died about '62 or 1863? A. Yes, sir. Q. Did you or your brother ever receive any benefit from the negro? A. No, sir. Q. Did you or he ever receive any consideration or benefit from the mares? A. No, sir."

On examination of Joel T. Arnold by defendants' counsel, the following questions and answers were made:

"Q. Did you know of the passage of the act authorizing the sale of this land while your grandfather was in the legislature? A. No, sir; I did not. Q. What did you hear at the time you heard of the trade with Austin? A. I heard that my mother and grandfather had traded off the home place in Missouri for a negro man and five head of mares. Q. What land did you understand this to be? A. Our old home place in Missouri, in Clay county. Q. What do you mean by 'old home place'? A. The place on which I was born and raised,—the land that is now in suit. Q. You mean the land that had been deeded by your grandfather Joel Turnham to your mother and her children? A. Yes."

These depositions the defendants took and caused to be filed in this case. They thus opened a Pandora's box in quest of desired helpful testimony; and, when they got more than they wanted, they now seek to get rid of it by a general objection that it is incompetent. In Speer v. Burlingame, 61 Mo. App. 86, the court, speaking of the objections of the parties who took the depositions and filed them in the cause to the other party reading them, for incompetency, said:

"Since the defendants themselves resorted to this method of proof of the contents of the original records of the bank, in their depositions, it is not perceived upon what ground they could be heard to complain of the action of the court. They took the deposition and filed it in the court. The plaintiff was present at the taking of it, and cross-examined the witness; and had the defendants not proved the existence of these by-laws, as was done without objection, it may be presumed the plaintiff would have taken steps to have done so himself; in that or some other way. To permit the defendants to object to the manner of proving the by-laws which they had adopted themselves, and to exclude the same on that ground, would visit upon plaintiff a hardship to which we cannot give our sanction."

So, here, it may be said that the presumption ought to be indulged that when the defendants themselves, in taking the deposition, had brought out the fact that the sale of the land was in exchange for personal property, the plaintiffs might well rest there, without pursuing the investigation further, to establish the fact by other testimony. If it is to be conceded that the witness was not present at the sale, and did not hear the negotiations and see the delivery of the personal property, we have yet in the depositions taken in this case the following physical facts testified to: This witness and his brother lived with their mother up to the time they entered the army, a short time before this alleged contract of sale was made. No such property as the negro and the mares was on the premises when they left. The evidence shows that Austin went to Texas about the time Mrs. Arnold moved there, with a lot of negroes and horses, and that he was engaged in racing horses in Texas. When plaintiffs returned to their mother's home, the latter part of 1862, they saw the negro and the mares there in her possession, which they

ascertained, on inquiry from her, to have been received from Austin in payment for the land. This was a matter of family history, 38 years' standing, when the depositions were taken. Was it not some evidence to the trior of the fact, after such a lapse of time, on this issue, especially when brought out by defendants, in response to their own inquiry? And may not the court reasonably draw therefrom the inference, in the absence of any countervailing testimony being introduced by defendants, that the fact was as the witness testified?

There is another matter of fact and law in this connection worthy of consideration. The power of attorney authorized the attorney in fact "for us and in our names to bargain, sell, alien, and convey unto William Austin a certain tract of land, situate, lying, and being in the county of Clay, state of Missouri, containing one hundred and sixty acres, and is described in the annexed bond for titles made by unto said William Austin, and to make said Austin a warranty deed to the same, and do all acts in reference to the same in as full and complete manner as we ourselves could do were we personally present doing the same, hereby ratifying and confirming whatsoever may be done by our said attorney in the premises." The sole reference to any title bond in this instrument, which is not annexed to the power of attorney in evidence, was merely for a more accurate description of the land. There is nothing on the face of the power of attorney to indicate that the attorney was authorized to sell and convey the interest of the minor children. Its language is, as already stated, "for us and in our names to bargain, sell, alien, and convey." It was by virtue of this power that the attorney conveyed the interest of Ann R. Arnold. In the deed by the attorney to Austin, while the making of the deed by Turnham to Ann R. Arnold and the heirs of her body, the act of the legislature, and the power of attorney are cited, no reference whatever is made to the title bond, or that he was executing merely a contract of sale theretofore made by his principals. On the contrary, the power of attorney authorized him to "bargain and sell"; and the deed made by him declares that, in conformity with the power to him delegated in said power of attorney, he has "bargained and sold" to the said William Austin the tract of land mentioned and described in the said instrument. This is the title of record under which the defendants claim. The donees of the legislative grant were endowed with a mere naked power. They were its sole depositories. It was essentially a personal trust. As such, they could not delegate the execution of the power in any essential particular to a third party. This is axiomatic. The power of attorney, on its face, was precisely what it would have been had the sole purpose been to authorize a sale and conveyance of the private property of Turnham and Ann R. Arnold. Clarke's Lessee v. Courtney, 5 Pet. 347, 8 L. Ed. 140. It may be conceded that, in order to execute a power, it is not always essential that the deed should recite or even refer to the power, where, from all the surrounding circumstances, it was manifestly the intention of the party to execute it. "But where the maker has an estate which will pass without executing the power, and the instrument is silent on that point, the law will presume that

he intended to convey such estate, and no more." Pease v. Iron Co., 49 Mo. 124. As Mrs. Arnold had a life estate in this land, there was something for the power of attorney to operate upon, and the presumption should arise from the face of the instrument itself that it was intended to convey such estate, and no more. No satisfactory reason appears on the face of the title papers relied on by defendants, nor in the whole evidence, for making the power of attorney to sustain the contention that its sole purpose was to authorize the manual act of the attorney in merely executing and delivering the deed to Austin. The title bond shows on its face that Turnham, Ann R. Arnold, and Austin, at its date, all resided at the same place in Texas. The presumption obtains that that status continued up to February, 1862, when the power of attorney was executed. If at that time the terms of the sale and the purchase price, etc., were all settled, why the necessity of making the power of attorney, and acknowledging it in due form, authorizing Downing in Clay county, Mo., to make the deed, when the principals could as easily and as well have made and delivered it directly to Austin? In the absence of any explanatory evidence aliunde, the inference must be that the purpose of making the power of attorney was to authorize the attorney to do precisely what it recites,—"to bargain and sell" the land for and in the name of the principals; and that is exactly what the deed of the attorney recites he did do. As the defendants deraign title under these instruments, why are they not concluded by the recitals? Daughaday v. Paine, 6 Minn. 452 (Gil. 308); Orrick v. Durham, 79 Mo. 178. So the sum of the matter is that the defendants, to make out a defense, must put in evidence a power of attorney, and deed made in exact accordance therewith, the recitals of which show the deed to be void. They then undertake to cure this apparent infirmity by evidence aliunde, by offering the title bond, which is void under the statute of frauds, as it fails to state the purchase price of the land; and therefore, in contemplation of law, the principals had not made a completed contract of sale of the land prior to the authority to Downing to bargain, sell, and convey.

The Statute of Limitations. As no cause of action arose in favor of plaintiffs for the recovery of their interest in the land until after the death of the life tenant, the statute of limitations did not begin to run against them until October, 1896, the date of the death of Mrs. Arnold. And as this suit was instituted in October, 1899, it is not barred, either by the lapse of time or adverse possession by defendants and their predecessors. Bone v. Tyrrell, 113 Mo. 182, 20 S. W. 796.

The remaining question to be determined is, what is the interest in the land recoverable by plaintiffs? The contention at the hearing by defendants' counsel that the deed from Turnham created an estate tail at common law, and as such the remainder-men had no alienable estate, which rule had not been changed by the statute in 1859, seems to me to prove too much; for, if that were so, the act of the legislature authorizing a sale of the contingent interest was ineffective to pass the title, as the legislature would have had

no power to reform it or change the title. But the grant is controlled by the provisions of chapter 32, Rev. St. 1845, the fifth section of which declares that:

"Every such conveyance or devise shall vest an estate for life only in such grantee or devisee, who shall possess and have the same power over and right in such premises, and no other, as a tenant for life thereof would have by law, and upon the death of such grantee or devisee, the said lands and tenements shall go and be vested in the children of such grantee or devisee, equally to be divided between them as tenants in common, in fee, and if there be only one child, then to that one, in fee, and if any child be dead, the part which would have come to him or her, shall go to his or her issue, and if there be no issue, then to his or her heirs."

Section 7 provides:

"Where a remainder shall be limited to the heirs, or heirs of the body, of a person to whom a life estate in the same premises shall be given, the persons who, on the termination of the life estate, shall be the heirs, or heirs of the body of such tenant for life, shall be entitled to take, as purchasers, by virtue of the remainder so limited in them."

This statute converted that estate into a life estate in Mrs. Arnold, "remainder in fee simple to the persons to whom the estate tail would go on the death of the first grantee." Emmerson v. Hughes, 110 Mo. 630, 19 S. W. 979; Bone v. Tyrrell, 113 Mo. 182, 20 S. W. 796. On the death of the life tenant the estate in remainder became vested in the surviving heirs of her body. Clarkson v. Hatton, 143 Mo. 47, 44 S. W. 761, 39 L. R. A. 748; Clarkson v. Clarkson, 125 Mo. 381, 28 S. W. 446.

The evidence showing that some of the children died during the life of Mrs. Arnold, without issue, and that there were four children, including plaintiffs, who survived her, the plaintiffs are entitled each to one undivided fourth part of the land. On the agreed statement of facts, and the further findings by the court, the court declares the law to be that the plaintiffs are entitled to recover each an undivided one-fourth interest in the land, with the rental thereof. Judgment accordingly.